**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JESSE JAMES MORGAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:09cv0924 TCM** |
| | ) | |
| **CITY OF ST. LOUIS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

This case is before the Court[1] on the opposed motion filed by defendants – the City of St. Louis ("the City"); John H. Clark, Chairperson of the Civil Service Commission ("the CSC") of the City; Stanley Newsome, Sr., Vice-Chairperson of the CSC; Timothy Ogle, CSC member; and David Visintainer, Water Commissioner of the City – asking for summary judgment in the two-count complaint filed by plaintiff, Jesse James Morgan, challenging the elimination of his position with the City.[2]

### Background

Plaintiff worked for the Water Division of the City's Department of Public Utilities as a Mechanical Maintenance Worker (Lead) until June 2004. (Def. Stat. of Facts[3] ¶ 1.) On

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2]This case was originally filed in state court and removed here on federal-question grounds.

[3]The citation to a party's "Stat. of Facts" refers to those facts which are admitted by the opposing party.

the tenth of that month, Plaintiff was given an "Employee Status Form" informing him that it was his last day at work. (Defs. Ex. G.) "Layoff" was the reason for his termination. (Id.) Attached to the form was an explanation: "You are being laid off for reason of lack of funds. This layoff does not reflect discredit on you as an employee. Your name will be placed on the re-employment from layoff list." (Id.)

The Department of Personnel for the City has defined the procedures to be followed when it is necessary to layoff a City employee "due to lack of work or lack of appropriate funds." (Pl. Ex. 4 at 1.) Those procedures, designated as Department of Personnel Administrative Regulation No. 107, provide, inter alia, that a layoff list shall be prepared at the request of the appointing authority. (Id.) The request is to include the class title to be reduced and the number of positions in that title that are to be eliminated. (Id.) The list is effective for three months from the date of issue. (Id. at 2.) The employees to be laid-off are to be given "as much advance notice as possible of the last date that the employee will be at work." (Id.) At a minimum, the notice is to "be at least one normal work week prior to the last day at work." (Id.) If an employee voluntarily transfers or accepts a demotion to another position before the effective date of the layoff, the employee's benefits continue without a break. (Id. at 3.)

David Visintainer, the appointing authority for the Water Division, wrote the Director of Personnel, William Duffe, on February 27, 2004, to request a layoff list. (Defs. Ex. E.) "Due to a lack of available funds," the Water Division was going to reduce its table of organization by two positions: a Construction and Maintenance Superintendent and a

Mechanical Maintenance Worker (Lead). (Id.) He requested that Duffe provide him with "one name who would be subject to layoff for each of these two classifications." (Id.)

On April 29, Kathleen Sullivan, the acting director for the Department of Personnel, wrote Visintainer with the list. (Defs. Ex. F.) The name provided for the Mechanical Maintenance Worker (Lead) ("MMW-L") position was Plaintiff's. (Id.) This is unsurprising given that Plaintiff was the only person in that position. (Pl. Ex. 49 at 20, [38].) The name provided for the Construction and Maintenance Superintendent was William Glaser. (Defs. Ex. F.) He also was the only person in that position. (Pl. Ex. 49 at 20, [38].) The letter further informed Visintainer that the employees to be laid-off were to receive at least one normal work week notice of the layoff prior to their last day of work. (Defs. Ex. F.)

The MMW-L position was included in the Water Division's worksheet for the fiscal year ending June 30, 2005.[4] (Pl. Ex. 49 at 20.) Also included in that worksheet was funding for two vacant Water Maintenance Foremen positions, eight vacant Water Maintenance Workers positions, and nine vacant Water Utility Worker positions.[5] (Id. at 5, 8, 12, 28.) The general description of the duties of a MMS-L are to "perform mechanical maintenance and repair to equipment and systems and lead maintenance crews." (Pl. Ex. 12.) A Water Maintenance Foreman "supervise[s] the daily operation of a crew installing, repairing and

---

[4]The City's fiscal year runs from July 1 of one year to June 30 of the next. (Kummer Dep., Pl. Ex. 59 at 6.) A fiscal year is referred to by the year it ends. (Id. at 7.) Thus, the fiscal year beginning July 1, 2004, and ending June 30, 2005, is referred to as the 2005 fiscal year.

[5]Visintainer testified that there were eight positions for which funds were allocated that were not filled when Plaintiff was laid-off. (Visintainer Dep., Defs. Reply Ex. at 83.)

maintaining water valves, mains, hydrants and fittings" and "ensure[s] the safety of the crew and equipment." (Pl. Ex. 15.) Water Maintenance Workers "install, maintain, service, replace and repair water system mains, valves, hydrants and other equipment." (Pl. Ex. 14.) Water Utility Workers "maintain and repair Water Division production and distribution systems." (Pl. Ex. 16.) When working as a MMW-L, Plaintiff was the "primary welder, steel fabricator, plumber, concrete finisher . . . [and] all around construction handyman." (Weissman Dep., Pl. Ex. 58 at 9.) "He had a wide ranging scope of knowledge and an ability to cover all facets of the position." (Id. at 10.)

James Kummer, the fiscal manager for the Water Division, draws up a proposed budget after meeting with, and obtaining information from, the five section heads about their payroll, equipment, and other needs for the upcoming fiscal year. (Kummer Dep., Pl. Ex. 59 at 5, 17-18.) For the fiscal year 2005, Fred Weissman was the section head for construction and maintenance. (Id. at 19; Weissman Dep., Pl. Ex. 57 at 8.) It was Visintainer, however, that directed Kummer to eliminate the MMW-L and other position from the budget proposal. (Kummer Dep., Pl. Ex. 59 at 21; Weissman Dep., Pl. Ex. 58 at 24.) Visintainer did not discuss his decision with either Kummer or Weissman. (Id.) The MMW-L and Construction and Maintenance Superintendent positions were the only occupied positions to be eliminated from the Water Division's 2005 fiscal year budget. (Pl. Ex. 53 at [5].) Two other positions were eliminated; however, these positions were not

funded and had not been authorized and/or occupied during the 2004 fiscal year.[6] (Id. at [4].) Asked in his deposition if he could recall during his twenty-five-year tenure at the Water Division any other positions that were occupied and not funded, Visintainer replied that he could not. (Visintainer Dep., Pl. Ex. 58 at 6, 21.)

By eliminating the MMW-L and Construction and Maintenance Superintendent positions approximately $107,000 was saved. (Visintainer Dep., Pl. Ex. 58 at 74.) The previous year, in August 2003, Visintainer received a report from Black & Veatch, independent consultants retained to evaluate the adequacy of the Water Division's water utility revenues as required by bond covenants. (Pl. Ex. 51.) The report concluded that "the City must enact a rate increase in fiscal year 2004, that began on July 1, 2003, to maintain compliance with its revenue bond covenants." (Id. at 1.) The following week, Kummer wrote the Water Division managers that a bill for a rate increase was being forwarded to the City administration. (Pl. Ex. 39.) If this bill did not pass, there would have to be "major layoffs across all levels of the Water Division." (Id.) A rate increase bill did pass, however, with the first increase of 9% taking effect on December 1, 2003, and the second rate increase of 4.5% taking effect on July 1, 2004. (Pl. Ex. 7 at 2, 7; Kummer Dep., Pl. Ex. 59 at 41.) The two increases resulted in an approximate 6 million dollar gain in revenue. (Kummer Dep., Pl. Ex. 59 at 42-43.)

---

[6]Specifically, the position of Water Department Liaison was authorized but not occupied and the position of Mechanical Engineer was neither authorized nor occupied. (Pl. Ex. 53 at [4].)

It was not, however, just a lack of funds that caused him to eliminate Plaintiff's position, according to Visintainer's deposition testimony. (Visintainer Dep., Pl. Ex. 58 at 22-23.) He felt that the Water Division was inefficient and needed to be more flexible by streamlining the table of organization. (Id. at 23-25.) There was an effort in 1995, 1996, or 1997, to privatize the Division. (Id. at 23-24.) In order to fight this effort and until he left, in 2007, he tried to reorganize the Water Division and make it more efficient. (Id. at 25.) Moreover, even with the rate increases the Water Division was "close to not being able to pay bills." (Visintainer Dep., Defs. Reply Ex. at 13.)

What was not a factor in Plaintiff's layoff, Visintainer testified in his deposition, was Plaintiff's strengths or weaknesses. (Visintainer Dep., Defs. Reply Ex. at 86.)

Plaintiff began work with the Water Division in June 1993 as a Mechanical Maintenance Worker. (Morgan Aff., Pl. Ex. 10 ¶ 3.) He was promoted to the MMW-L position in 1996. (Id.) His direct supervisor was Jack Ellis. (Id. ¶ 5; Ellis Dep., Pl. Ex. 56 at 10, 12.)

The first year Ellis rated Plaintiff's job performance was for the period ending April 30, 1995. (Pl. Ex. 27.) He rated Plaintiff Outstanding in Work Quality and in Work Quantity and as Proficient in Relationships Affecting Work and Work Habits.[7] (Id.) Plaintiff's rating in Work Quality did not change until his service rating for the rating period ending June 14, 2003. (Pl. Exs. 28-36.) His rating in Work Quantity did not change until

_____

[7]Customer Service was added in 1997 as a category to be rated. Plaintiff's performance in this area is not at issue.

the period ending February 2001.  (Pl. Exs. 28-33.)  His rating in Relationships Affecting

Work and in Work Habits varied between Outstanding and Proficient until his rating for the

period ending February 2000.  (Pl. Exs. 28-32.)  Specifically, he was rated Outstanding in

Relationships Affecting Work in 1996, 1997, and 1999 and in Work Habits in 1998 and in

1999.  (Pl. Exs. 28-31.)  Otherwise, and in his ratings for 2000, 2001, 2002, and 2004, he

was rated Proficient.  (Pl. Exs. 28-30, 32-34, 44.)  Ellis explained the Outstanding rating he

gave Plaintiff in 1996 and again in 1997 for Relationships Affecting Work:  "Mr. Morgan

demonstrates complete cooperation with supervisors as well as fellow employees.  His

professional attitude when interacting with other sections, department or the general public

has been exemplary."  (Pl. Ex. 28 at 3; Ex. 29 at 3.)  When rating Plaintiff Proficient in

Relationships Affecting Work in 2000, Ellis noted that Plaintiff "ha[d] been co-operative and

courteous in his relationships with his peers, co-workers and supervisory personnel."  (Pl.

Ex. 32 at 4.)  Ellis explained the Proficient rating given Plaintiff in 2001 in this same

category as follows:  "Mr. Morgan is adaptable, tactful and cooperative in his relations with

his peers, co-workers and supervisory personnel.  He has shown a good attitude when

receiving instructions and directions regarding work assignments."  (Pl. Ex. 33 at 3.)  For the

June 2003 period, Plaintiff was rated Proficient in Work Quality and Work Quantity,

Adequate in Relationships Affecting Work, and Needs Improvement in Work Habits.  (Pl.

Ex. 36.)  In explanation of the Work Quality rating, Ellis referred to a May 21, 2003,

counseling given Plaintiff for failure to follow work instructions.[8]  (Id. at 3.)  Ellis also praised the "overall quality"of Plaintiff's work as "very good."  (Id.)  "His job knowledge, fabrication and welding skills are also good . . . . and his ability to understand the mechanical components of a given work project has been above average."  (Id.)  Ellis explained the Needs Improvement rating in Work Habits by referring to a reprimand letter Plaintiff received for exceeding the acceptable levels of sick leave.  (Id.)  For the first time, Plaintiff received an overall rating of Adequate.  (Id. at 1.)  For the February 2004 rating period, Plaintiff was rated as Proficient in all categories.  (Pl. Ex. 44.)

Regulation 107(II)(B) requires that vacant positions be filled from a list of laid-off employees who had service ratings of at least Proficient.  (Pl. Ex. 4 at 3.)  Consequently, Plaintiff would be ineligible for reemployment based on his June 2003 Adequate overall rating.  He appealed this rating.  (Pl. Ex. 36 at 4-5.)  In his supporting letter, Plaintiff focused on the counseling, arguing that it was unjustified and that Ellis had no first-hand knowledge of the underlying circumstances, and on the reprimand for excessive leave, arguing that the need for the leave arose from stress on the job and should have been considered family leave.

---

[8]The counseling was given Plaintiff on May 21, 2003, for allegedly not cutting some concrete as instructed.  (Pl. Ex. 25 at [5]-[6].)  Plaintiff responded that the write-up was unfair because, in part, Ellis was not at work that day, was issuing the write-up on inaccurate hearsay, and should have spoken with him prior to writing him up.  (Id. at [5].)

The following month, Plaintiff was again written-up.  (Pl. Ex. 26.)  Ellis reported that he had encountered Plaintiff on June 19 smoking a cigarette in the maintenance shop.  (Id. at [6].)  This was against the Water Division's non-smoking policy.  (Id.)  Plaintiff challenged the write-up on the grounds that he and Ellis and met outside the building and he was not smoking, but simply had an unlit cigarette in his mouth and a lighter in his hand.  (Id. at [4].)  He questioned Ellis' motivation.  (Id.)

(Id. at 4.) The next week, he wrote a second letter also challenging his rating for Relationships Affecting Work based on his disagreement with the leave reprimand and with any implication that he does not follow instructions. (Id. at 5-6.) Following a hearing on Plaintiff's appeal before the Service Rating Appeals Board, at which the Water Division did not appear, the Board recommended that the Work Habits rating be changed to Proficient based on a failure to offer Plaintiff Family and Medical Leave on two occasions during the rating period. (Pl. Ex. 38 at 3.) This raised his overall rating to Proficient and made him eligible for reemployment should he be laid off. (Id. at 3.) The other two challenged ratings were not changed. (Id.) The Director of Personnel, Duffe, adopted the Board's recommendation. (Pl. Ex. 41.)

In February 2004, Visintainer scheduled an administrative hearing on February 12 "to consider punitive disciplinary action" against Plaintiff for allegedly "fail[ing] [the day before] to follow supervisor's instruction to return to the office with [his] paper work after a Workmen's Compensation doctor's visit." (Pl. Ex. 42.) Herman Smith was to represent Visintainer at the hearing. (Id.) Following this hearing, Visintainer decided that a written reprimand would be the more appropriate response. (Pl. Ex. 43.) He advised Plaintiff "to correct [his] deficient work related behavior" and cautioned him that failure to do so "will result in more severe action." (Id.)

The following month, Plaintiff wrote Visintainer that he would "accept the offer of a transfer to [another crew]" if there was no loss of pay and the position was that of a Water Maintenance Mechanic. (Pl. Ex. 45.) Plaintiff avers that he was offered the transfer during

the February 12 hearing.  (Pl. Ex. 10 ¶ 35.)  Visintainer replied on March 18 that Plaintiff had been misinformed or had misunderstood the conversation.  (Pl. Ex. 46.)  He had not been offered a transfer during the hearing and there was no vacant position on the other crew.  (Id.)  Visintainer would likely approve a transfer to another department or division with the City if Plaintiff found such a position and obtained the approval of the appropriate appointing authority.  (Id.)

As noted above, Plaintiff was laid-off three months later.  He wrote the City mayor contesting the reasons given for his layoff and alleging that the true reason was "past events" he had grieved.  (Def. Ex. 9 at [2].)  After his letter was forwarded to the CSC, he was advised that he could appeal his layoff if he believed it "was not for a legitimate reason and/or was not in accordance with applicable rules and regulations . . . ."  (Id. at [3].)  Plaintiff did appeal, arguing that the Water Division could have taken other cost-cutting measures before laying him, "a productive worker," off and that the number of management employees in the Water Division was needlessly high.  (Id. at [4].)  In a subsequent supporting letter to the CSC, Plaintiff outlined events which he believed caused his layoff.  (Id. at [7]-[9].)  These events included being "blamed" for work or mistakes he did not do (February 1994; October 1999) or for not doing something he was not told to do (August 2001).  (Id. at [7].)  The events also included grievances Plaintiff had filed about management interrupting his lunch (March 2001),[9] carpenters doing his work and getting

---

[9]This grievance involved time Plaintiff worked during his lunch break on March 19 and March 21.  (Pl. Ex. 21.)  The CSC found that Plaintiff should be compensated for the ten minutes his lunch

paid overtime (September 2001),[10] "verbal abuse" from Ellis (May 2003), and being written up by Ellis based on hearsay (June 2003). (Id.) Plaintiff referred to an August 2003 statement by Weissman that Plaintiff's service ratings would be affected if he continued to file grievances and to the above-described offer of a transfer and the subsequent repudiation. (Id.) He also referred to letters written "[s]ome time ago" to Aldermen and the Mayor "about the new treatment basins at the Chain of Rocks and about the treatment of the employees by Management." (Id. at [8].) He was suspected of writing these letters, but he did not. (Id. at [8]-[9].)

The CSC reviewed his layoff and concluded, without a hearing, that it "was for a legitimate reason and in accordance with the applicable rules and regulations." (Defs. Ex. H.) Specifically, the MMW-L position was not funded for fiscal year 2005 and the layoff list for the MMW-L position was prepared at the request of the appointing authority and designated Plaintiff for layoff. (Id.)

In Count I of his complaint, Plaintiff requests that either the CSC be ordered to conduct an evidentiary hearing on his appeal from his layoff or the Court conduct a hearing. A hearing is necessary, Plaintiff argues, because his layoff for an alleged lack of funds was a pretext for terminating him in retaliation for his exercise of his First Amendment rights and

_____

break was shortened by on March 19, but not for the ten to twenty seconds during which his supervisor spoke to him when he was at lunch on March 21. (Pl. Ex. 23 at [3]-[4].)

[10]This grievance involved Ellis assigning carpenters to work overtime to install rebar for a concrete pour. (Pl. Aff., Ex. 10, ¶ 9.) Plaintiff contended that such work should have been performed by Mechanical Maintenance Workers. (Id.)

was a violation of those rights and of his due process rights.  Claiming that his layoff also violated his rights under the City's Charter and the Personnel Rules and Regulations, Plaintiff alleges that the (1) CSC's findings and conclusions affirming his layoff "are not supported by substantial and competent evidence on the record as a whole," but are "contrary to the overwhelming weight of the evidence," and (2) decision to lay him off was unlawful in that (a) there were adequate funds to pay his salary through at least June 30, 2004, and (b) there were adequate anticipated revenues to pay his salary for the fiscal year 2005.[11]  (Id. ¶ 14(A)-(C).)  One of the rules relied on by Plaintiff is Regulation No. 51, which sets forth procedures to be followed within the City's operating departments for "addressing and resolving problems."  (Pl. Ex. 3.)  Such problems specifically do not include service ratings and employment status.  (Id.)  The regulation provides that employees "may seek resolution of problems without fear of discrimination, coercion, restraint, or reprisal."  (Id.)  Another rule, Regulation No. 117, sets forth the procedure to be followed when an employee is dismissed for disciplinary reasons.  (Pl. Ex. 5 at 3-5.)  This procedure requires a pre-termination review preceded by the employee receiving written notice of, among other things, the charges against him or her.  (Id.)  If the employee disagrees with the outcome of this review, the employee may appeal to the CSC and will then be granted "such hearing or other review as soon as possible considering the nature of the appeal . . . ."  (Pl. Ex. 2 at 61.)

---

[11]In support of this argument, Plaintiff submits the report of Thomas A. Norton, CPA/CFF, concluding, in part, that "[t]he overall financial position of the Water Division strongly indicates that there were adequate funds to pay Mr. Morgan . . . for FY 2005."  (Pl. Ex. 60 at 7.)

<u>See</u> <u>also</u> Personnel Rule XIII(1)(a) (providing for "a hearing or other review" when "a regular permanent employee . . . believes he has been dismissed, retired, demoted, suspended or reduced in pay without just cause . . . .") (Pl. Ex. 2 at 61.)

Other Personnel rules require that the Director aid appointing officers in, among other things, "determining the number and kinds of positions needed to carry on the City's business . . . ." (Pl. Ex. 2 at 12.) Employees who are in unnecessary and supernumerary positions are to be transferred without loss of status to other vacant positions under the same or different appointing authorities. (<u>Id.</u> at 12-13.)

Citing 42 U.S.C. § 1983,[12] Plaintiff contends in Count II that he was laid off in retaliation for exercising his First Amendment rights by (1) writing the Board of Aldermen "criticizing the Water Division for wasting public funds and manpower and mistreating fellow employees" and (2) exercising his right to file grievances and an appeal . . . regarding his service rating of June . . . 2003." (Compl. ¶ 14(D).) Specifically, he avers that:

> Between 2001 and when my position was written out of the budget in 2004 I sent five or six letters to the Aldermen of the City of St. Louis. I didn't sign the letters out of fear of retaliation based on Mr. Ellis' reaction to my grievances and what Mr. Weissman told me about what would happen if I filed grievances. I knew the supervisors and the managers at the Water Division thought that I wrote the letters[13] because the content often referenced my

---

[12]Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ." The City is a "person" within the meaning of § 1983. **City of St. Louis v. Praprotnik**, 485 U.S. 112, 121 (1988).

[13]Indeed, Weissman testified that he suspected that the unsigned letters to the Board of Aldermen about waste at the Water Division were written by Plaintiff. (Weissman Dep., Pl. Ex. 57

circumstances or complaints and suggestions that I had made directly to management and based on the increasingly harsh treatment of me by management.

(Pl. Aff., Pl. Ex. 10 ¶ 12 (footnote added).)  Plaintiff further avers that "[o]ver the span of three years, [he] wrote the Aldermen telling them about the waste of money and materials at the Water Division." (Id. ¶ 15.)  "[He] informed the Aldermen that the Water Division had purchased 18,000 feet of pipe in 1998 or 1999 to help drain water . . . .  Although the job was surveyed, the pipe was never installed." (Id. ¶ 16.)  He also wrote the Aldermen about a major project of Visintainer's that was ill-conceived, poorly executed, and a significant waste of money and about incorrect piping installed in a project at a cost of "thousands of dollars." (Id. ¶¶ 17-18.)  He wrote the Aldermen about Ellis's behavior toward employees, Weissman's work habits, and Ellis' driving mishaps. (Id. ¶¶ 19-20.)

Plaintiff also contends that he is entitled to redress under § 1983 on the grounds that his layoff violated his Fourteenth Amendment rights to due process because he was not given (1) a pre-deprivation hearing; (2) adequate notice in that (a) there was no "reasonably accurate description of the manner in which the initial decision was reached to layoff [Plaintiff]" and (b) no disclosure of the data or information relied on when it was decided to lay him off; (3) an evidentiary hearing on his appeal and on his allegation that the layoff was a pretext for retaliating against him for exercising his First Amendment rights; and (4) a review of the underlying reason for his layoff. (Compl. ¶ 14(F)-(H).)

_____

at 46.)  He never verified this suspicion or asked Plaintiff whether he was the author. (Id.)

Defendants argue in their pending motion that they are entitled to summary judgment because Plaintiff was laid-off due to a lack of funds and not in retaliation for exercising his First Amendment rights or in violation of his due process rights. Moreover, they are entitled to qualified immunity "because they did not violate clearly established constitutional standards of which reasonable officials in their positions would have been aware." (Defs. Mtn. ¶ 6.) Their relevant acts were discretionary. Plaintiff's speech did not involve a matter of public concern. Additionally, the CSC had found that Plaintiff's lay-off was effectuated in accordance with the applicable rules and resulted from a lack of authorization and funding for his position for the 2005 fiscal year. No evidentiary hearing was required because his lay-off was not a contested case as defined by Mo.Rev.Stat. § 536.010.[14]

Plaintiff disagrees.

## Discussion

"'Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" **Loeb v. Best Buy Co.**, 537 F.3d 867, 871 (8th Cir. 2008) (quoting Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007)). When making this determination, the Court views the evidence, and any reasonable inferences therefrom, in the light most favorable to Plaintiff. **Id.** In opposing a properly-supported motion for summary judgment, Plaintiff may not "merely point to unsupported

---

[14]Section 536.010(4) defines a "contested case" as "a proceeding before an agency in which legal rights, duties or privileges of specific parties are required by law to be determined after hearing[.]"

self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor." **Bass v. SBC Commc'ns, Inc.**, 418 F.3d 870, 872-73 (8th Cir. 2005). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" **Id.** (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

Count I.  In their one-paragraph argument for summary judgment on Plaintiff's first count, Defendants contend that a layoff is not a contested case within the meaning of § 536.010(4), see note 14, supra, and, therefore, there was no requirement of an evidentiary hearing.  In their reply memorandum, Defendants further argue that the record before the CSC and now before the Court establishes that Plaintiff's layoff was "for budgetary and financial reasons" and was not retaliatory.  (Reply Mem. at 2.)

The Supreme Court of Missouri recently discussed the differences between a contested case and noncontested case.  "Contested cases provide the parties with an opportunity for a formal hearing with the presentation of evidence . . . and require written findings of fact and conclusions of law." **City of Valley Park v. Armstrong**, 273 S.W.3d 504, 506 (Mo. 2009) (en banc) (per curiam).  "The review of a contested case is a review by the trial court of the record created before the administrative body." **Id.**  "Non-contested cases do not require formal proceedings or hearings before the administrative body." **Id.**  Consequently, the trial court has no record to review, "but hears evidence, determines facts, and adjudges the validity of the agency decision." **Id.**  "In either a contested or a

non-contested case the private litigant is entitled to challenge the governmental agency's decision. The difference is simply that in a contested case the private litigant must try his or her case before the agency, and judicial review is on the record of that administrative trial, whereas in a non-contested case the private litigant tries his or her case to the court." **Id.** at 506-07. The question whether a case is noncontested or contested is a question of law. **Id.** at 506; accord **Sapp v. City of St. Louis**, — S.W.3d —, 2010 WL 2749645, * 2 (Mo. Ct. App. July 13, 2010).

In **Walker v. Personnel Advisory Bd.**, 670 S.W.2d 1 (Mo. Ct. App. 1984), the court held that a layoff was not a contested case. **Id.** at 4. The layoffs in question were challenged on the grounds that they were not caused by a lack of funds, as alleged, but by personal animosity toward the terminated employees. The court noted that "[n]o statute, municipal charter or ordinance requires a pre-termination hearing for an employee who is to be laid off"; that the appointing authority had the discretion to lay off public employees when there was a fiscal need; and that due process did not require a pre-termination hearing because no stigma attached to the layoffs at issue. **Id.** at 3-4. The court further held, however, "[t]hat the case . . . is not a contested case does not mean that [the agency's] actions are unreviewable. The [agency] should be required to do more than make a bare allegation that the layoffs resulted from a budgetary crisis." **Id.** at 4. The layoffs were therefore reviewable under Mo.Rev.Stat. § 536.150[15] as a non-contested case. **Id.** at 5.

---

[15]Section 536.150.1 provides:
When any administrative officer or body existing under the constitution or by statute

Plaintiff requests a hearing on his claim that his layoff was a pretext for retaliation. Whether that hearing is to be before the CSC or this Court is not the question framed by Defendants in their motion. Rather, they contend that what forum holds the hearing is irrelevant because the record establishes that Plaintiff's layoff was for financial reasons. As set forth below, the reason for the layoff remains a genuine issue of material fact.

Count II. The City of St. Louis. Plaintiff seeks to hold the City liable under § 1983 for the allegedly unconstitutional actions of the CSC members and Visintainer.

"To establish municipal liability under § 1983, a plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." **Moyle v. Anderson**, 571 F.3d 814, 817 (8th Cir. 2009) (citing Monell v. N.Y. Dep't of Soc. Servs., 436 U.S. 658, 690-92 (1978)). Plaintiff alleges that Visintainer's and the CSC members' actions were done "pursuant to the customs and practices of Defendant City to deprive Morgan of his right to free speech and procedural due

---

or by municipal charter or ordinance shall have rendered a decision which is not subject to administrative review, determining the legal rights, duties or privileges of any person, . . . and there is no other provision for judicial inquiry into or review of such decision, such decision may be reviewed by suit for injunction, certiorari, mandamus, prohibition or other appropriate action, and in any such review proceeding the court may determine the facts relevant to the question whether such person at the time of such decision . . . had such right, or was entitled to such privilege, and may hear such evidence on such question as may be properly adduced, and the court may determine whether such decision, in view of the facts as they appear to the court, is unconstitutional, unlawful, unreasonable, arbitrary, or capricious or involves an abuse of discretion; and the court shall render judgment accordingly, and may order the administrative officer or body to take such further action as it may be proper to require; but the court shall not substitute its discretion for discretion legally vested in such administrative officer or body . . . .

process protected by the First and Fourteenth Amendments . . . ." (Compl. ¶ 19.) Defendants argue that, in addition to the City not having an explicit policy authorizing the layoff of employees for exercising their freedom of speech, there is no custom or practice authorizing such or permitting a violation of an employee's due process rights.

"There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with 'deliberate indifference' to its known or obvious consequences." **Id.** at 817-18 (citing Seymour v. City of Des Moines, 519 F.3d 790, 800 (8th Cir.2008)). "Where an official policy is itself unconstitutional or directs employees to take unconstitutional action, no evidence beyond a statement of the policy and its exercise is necessary to establish § 1983 liability." **Id.** at 818 (citing Szabla v. City of Brooklyn Park, 486 F.3d 385, 389-90 (8th Cir.2007)).

Plaintiff does not dispute the City's disavowment of a policy violating his constitutional rights or of directing an employee to do so. Moreover, no evidence of such a policy has been submitted or otherwise indicated. See **Praprotnik**, 485 U.S. at 121 (finding no municipal liability under § 1983 for laid-off employee's First Amendment retaliation claim when there was "no ordinance designed to retaliate against [employee] or similarly situated employees"). Rather, the City's Personnel rules explicitly prohibit retaliating against someone for exercising their constitutional rights and it is the City's

explicit policies governing the process for laying off or terminating an employee that form the basis for his due process challenges.  See **Id.** (noting when rejecting § 1983 claim against City that the City had "established an independent [CSC] and empowered it to review and correct improper personnel decisions).

To establish the City's liability under § 1983 under the second method, Plaintiff must show that the City "has maintained 'a policy in which the inadequacy is so obvious, and the inadequacy is so likely to result in the violation of constitutional rights' that the policymakers can be said to have been deliberately indifferent."  **Moyle**, 571 F.3d at 818-19 (quoting City of Canton v. Harris, 489 U.S. 378, 390 (1989)).  The burden of establishing liability under this method is "high."  **Id.** at 818.  "A showing of simple or even heightened negligence will not suffice."  **Id.** at 819.  Plaintiff has failed to carry his burden.  Aside from his conclusory allegation that Visintainer and the CSC members acted pursuant to "customs and practices" of the City to deprive him of his constitutional rights, he has not identified either.  See **Springdale Educ. Ass'n v. Springdale Sch. Dist.**, 133 F.3d 649, 651 (8th Cir. 1998) (dismissing § 1983 claims against municipality in case in which alleged actions were specifically attributed to supervisor and not the result of any official policy or widespread custom).

Plaintiff's claims in Count II against the City shall be dismissed.

Qualified Immunity.  In Count II, Plaintiff seeks to hold Visintainer and the CSC members liable in their individual capacities.[16]  Visintainer and the members argue that they are entitled to qualified immunity.

The qualified immunity doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  **Harlow v. Fitzgerald**, 457 U.S. 800, 818 (1982).  In addressing qualified immunity issues, the Court considers, in any order, whether the facts alleged or shown by the plaintiff make out a violation of a federal constitutional right and whether the constitutional right at issue was clearly established at the time of the defendant's alleged misconduct.  **Pearson v. Callahan**, 555 U.S. —, 129 S.Ct. 808, 818 (2009).

Defendants do not address the second consideration.[17]  Rather, they argue that they are entitled to qualified immunity because the record establishes that Visintainer properly exercised his discretionary authority to layoff an employee for lack of funds and the CSC

---

[16]Qualified immunity is only available to government employees sued in their individual capacity.  See **Bankhead v. Knickrehm**, 360 F.3d 839, 844 (8th Cir. 2004).

[17]Any such challenge would be unavailing.  Five years before the actions at issue, the Eighth Circuit Court of Appeals noted that it "repeatedly has held that retaliation against the exercise of First Amendment rights is a basis for section 1983 liability" and that the defendants "could not have reasonably believed [in 1997] that their actions comported with clearly established law."  **Pendleton v. St. Louis County**, 178 F.3d 1007, 1011 (8th Cir. 1999).  Accord **Lindsey v. City of Orrick, Mo.**, 491 F.3d 892, 902 (8th Cir. 2007).  The Supreme Court had held thirty years earlier that a public employee had a First Amendment right to comment on matters of *public* interest in connection with their work.  **Pickering v. Bd. of Educ.**, 391 U.S. 563, 568 (1968).

members affirmed that decision after reviewing the record before them. As explained below, the record does not conform to Defendants' view.

Plaintiff's First Amendment Rights. A citizen's First Amendment right to free speech applies in the government work place. **Wingate v. Gage County Sch. Dist., No. 34**, 528 F.3d 1074, 1080-81 (8th Cir. 2008). Consequently, "[a] public employer 'may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.'" **McGee v. Public Water Supply Dist. # 2**, 471 F.3d 918, 919 (8th Cir. 2006) (quoting Rankin v. McPherson, 483 U.S. 378, 383 (1987)). First Amendment employment retaliation claims are analyzed under a three-step burden-shifting test. **Morris v. City of Chillicothe**, 512 F.3d 1013, 1018 (8th Cir. 2008).

> First, a public employee must show that he suffered an adverse employment action that was causally connected to his participation in a protected activity. Once the employee satisfies his initial burden, the burden shifts to the employer to show a legitimate, nondiscriminatory reason for his or her actions. If the employer meets this burden, the burden shifts back to the employee to show that the employer's actions were a pretext for illegal retaliation. This third step of showing that a defendant's justification for [the adverse employment action] is unworthy of credence is harder to overcome than the prima facie case because evidence of pretext is viewed in the light of the employer's justification.

**Id.** at 1018-19.

Defendants do not dispute that a layoff is an adverse employment action. Therefore, the first inquiry is whether Plaintiff's layoff was causally connected to protected activity. This is a question of law and not of fact. **McCullough v. Univ. of Ark. for Med. Sciences**, 559 F.3d 855, 866 (8th Cir. 2009); **Cox v. Dardanelle Public Sch. Dist.**, 790 F.2d 668, 672

n. 4 (8th Cir. 1986). "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." **Garcetti v. Ceballos**, 547 U.S. 410, 419 (2006). "In contrast, where a public employee speaks out in public or in private on matters that relate solely to the employee's parochial concerns as an employee, no First Amendment interests are at stake." **Wingate**, 528 F.3d at 1081. In deciding whether speech addresses a matter of public concern, the Court looks to the "content, form, and context of a given statement, as revealed by the whole record," as well as the manner, time, and place of the employee's speech. **Id.** Speech that "deal[s] with personnel matters" usually does not address a matter of public concern. **Belk v. City of Eldon**, 228 F.3d 872, 879 (8th Cir. 2000). If the speech at issue is on a matter of public concern, then Plaintiff's "'right to comment on [such] matters . . . must next be balanced with [his] [employer's] interest in promoting the efficiency of the public services it performs through its employees.'" **McCullough**, 559 F.3d at 866 (quoting Sparr v. Ward, 306 F.3d 589, 594 (8th Cir. 2002) (last alteration in original). "'When speech relates both to an employee's private interests as well as matters of public concern, the speech is protected if it is primarily motivated by public concern.'" **Id.** (quoting Altonen v. City of Minneapolis, 487 F.3d 554, 559 (8th Cir. 2007)). The employee bears the burden of demonstrating that his or her speech is protected. **Altonen**, 487 F.3d at 559.

Plaintiff's speech falls into one of two categories: mistreatment of employees, particularly him, and misuse of funds. The former include his complaints about Ellis'

management style, Ellis' assessments of his performance, Ellis' assignment of duties to be performed during a lunch break and his speaking with Plaintiff during breaks about job-related matters, Ellis' assignment of other trades to perform work Plaintiff contends he should have been paid overtime to do, and Ellis unfairly blaming Plaintiff for mistakes or undone work. The complaints criticize Ellis as a supervisor and not as a public official. Cf. **Belk**, 228 F.3d at 878 ("Speech that criticizes a public employer in his capacity as a public official also addresses matters of public concern."). These complaints are "entirely internal" to the Water Division and are not on matters of public concern. See **McCullough**, 559 F.3d at 866 (finding complaints of sexual harassment by employee asked to respond to such complaints against him were "entirely internal" and not protected); **Sparr**, 306 F.3d at 595 (speech at issue was "entirely internal to [employer's] office" and was not protected). They were raised in response to Plaintiff's performance ratings and his appeals to the CSC from the "Adequate" rating and from his layoff. See **Wingate**, 528 F.3d at 1081 (teacher's complaints to superintendent or School Board about job classification, request for explanation of why she was not interviewed, and a request to move to full-time position from part-time involved her "own personal interests[,]" not matters of public concern); **Bailey v. Dep't of Elementary and Secondary Educ.**, 451 F.3d 514, 519-20 (8th Cir. 2006) (holding that employee did not engage in protected speech by writing to management complaining about supervisor and procedures); **Allen v. City of Pocahontas, Ark.**, 340 F.3d 551, 556-57 (8th Cir. 2003) (employee's statements about housing authority supervisor's disrespectful and demeaning

attitude toward tenants were not matters of public concern); **Sparr**, 306 F.3d at 594-95 (employee's internal memorandum about supervisor's management style was not on a matter of public concern).

Plaintiff further alleges, however, that he wrote the Board of Aldermen and the Mayor about misuse by the Water Division of public funds. This speech is on a matter of public concern.[18] See **Belk**, 228 F.3d at 879; **de Llano v. Berglund**, 282 F.3d 1031, 1037 (8th Cir. 2002). See also **Bailey**, 451 F.3d at 519 (noting that Eighth Circuit "generally regard[s] expenditure of public funds to be a matter of public concern"). Normally, an inquiry would then be made into whether there was a causal connection between the protected speech and the adverse employment action[19] and into whether that speech adversely affected the efficiency of the Water Division.[20] Defendants did not address either question, choosing to

---

[18]Plaintiff's complaint about too many management positions is not a matter of public concern. See **Tuttle v. Missouri Dep't of Agriculture**, 172 F.3d 1025, 1034 (8th Cir. 1999) (employee's comments about employer's decision to cut back on some positions and not on others was not matter of public concern). This complaint was made in the context of Plaintiff being laid-off and was clearly motivated by Plaintiff's self-interest. See **McCullough**, 559 F.3d at 867 (holding that the focus when considering whether a public employee's speech is private is on the employee's purpose in speaking).

[19]To prevail at trial, Plaintiff must establish that the protected activity was a substantial or motivating factor in Defendants' decision to lay him off. See **McCullough**, 559 F.3d at 865. A causal link between protected speech and an adverse employment action can be inferred from temporal proximity between the two. **Davison v. City of Minneapolis, Minn.**, 490 F.3d 648, 657 (8th Cir. 2007). The record is not clear when, or if, Plaintiff wrote the letters complaining about the misuse of public funds.

[20]The Court notes that the balancing of an employer's interest in efficiency with the employee's interest in speech is not required if there is no evidence that speech adversely affected that efficiency. **Shockency v. Ramsey County**, 493 F.3d 941, 949 (8th Cir. 2007) ("[T]he Pickering balancing test only need be conducted if a government employer has produced evidence of workplace disruption.");

rely only on their position that Plaintiff's lay-off was for lack of funds. The Court will assume, therefore, that Plaintiff has met his initial burden of establishing a prima facie case of retaliation for speaking on matters of public concern. Defendants then have the burden of showing a legitimate, nonretaliatory basis for laying Plaintiff off. See **Morris**, 512 F.3d at 1019; **Davison**, 490 F.3d at 658. To carry this burden, they submit Visintainer's letter asking the Director of Personnel for a layoff list of names in two positions. The explanation in the letter is that "[d]ue to a lack of available funds," the Water Division was going to reduce its table of organizations.

Assuming, without deciding, that this explanation satisfies Defendants' burden, the Court looks to whether Plaintiff has shown that this explanation is pretextual. "An employee can prove that [his] employer's articulated justification for an adverse employment action is pretext . . . by showing that the employer's proferred explanation is unworthy of credence." **Jones v. Nat'l American Univ.**, 608 F.3d 1039, 1046 (8th Cir. 2010) (internal quotations omitted). See also **Morris**, 512 F.3d at 1019 ("Pretext may be shown with evidence that an employer has proffered an explanation with no basis in fact . . . .").

Several considerations guide the Court's inquiry in this case. Plaintiff has submitted evidence – not challenged by Defendants – that there was no shortage of funds. In addition to Norton's report, the list of positions in the Water Division for the 2005 fiscal year includes at least eight vacant positions. Visintainer testified, however, that it was a combination of

accord **Lindsey**, 491 F.3d at 900.

lack of funds *and* a need to make the Water Division more efficient that led to his layoff request. The validity of this explanation is a genuine issue of material fact. Visintainer also testified that he was concerned about the efficiency of the Water Division at least by 1997. Seven years later, for the first time in his twenty-five year tenure, he requested a layoff list for two positions that each was occupied by only one person. One position was occupied by a man with whom, according to Weissman's deposition testimony, Visintainer had a "rather stressed working relationship." (Pl. Ex. 57 at 41.) The other position was occupied by Plaintiff, a man who had criticized Visintainer's use of public funds. Visintainer requested the layoff list in February. One month later, he wrote Plaintiff that the position Plaintiff wanted to transfer to was not available. According to Visintainer's deposition testimony, there were then eight vacant positions in the Water Division. Although Visintainer also testified that he had no quarrel with the quality of Plaintiff's work, his letter to Plaintiff suggested only that Plaintiff might want to transfer to another department or division. Personnel rules require that a soon-to-be laid-off employee be given at least a week notice and, preferably, as much notice as possible. Visintainer wrote in February for the layoff list, knowing beforehand which names would be on that list. Weissman learned of the elimination of Plaintiff's and Glaser's positions in late April or May 2004. (Pl. Ex. 57 at 25.) Yet, in violation of the Personnel rules, Plaintiff was not informed of his layoff until the effective day of that layoff.

"'In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a [retaliatory] purpose.'"

**Torgerson v. City of Rochester**, 506 F.3d 584, 597 (8th Cir. 2010) (quoting <u>Reeves v.</u> <u>Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 147 (2000)).  The record before the Court compels the conclusion that an inference of impermissible retaliation can by made from the inconsistencies underlying Defendants' proffered reason for laying Plaintiff off.  The Court also notes that Plaintiff was apparently not laid off in accordance with the City's Personnel rules.  A "failure to follow established procedures may be evidence of pretext for [retaliation] . . . ."  **Dixon v. Pulaski County Special Sch. Dist.**, 578 F.3d 862, 872 (8th Cir. 2009).

<u>Plaintiff's Due Process Rights.</u>  Plaintiff also alleges in Count II that he was denied his Fourteenth Amendment rights to procedural due process.  "A public employee has a property interest when there are 'contractual or statutory limitations on the employer's ability to terminate an employee,' . . . ."  **Bennett v. Watters**, 260 F.3d 925, 927 (8th Cir. 2001) (quoting <u>Winegar v. Des Moines Indep. Cmty. Sch. Dist.</u>, 20 F.3d 895, 899 (8th Cir. 1994)). A city's employment policies and procedures may establish "'a legitimate claim of entitlement'" to a job.  <u>See</u> **Thompson v. Adams**, 268 F.3d 609, 611-12 (8th Cir. 2001) (quoting <u>Board of Regents v. Roth</u>, 408 U.S. 564, 577 (1972)).  Under the Personnel Rules for the City, Plaintiff had a right to notice, a pre-termination review, and a hearing if he was being terminated for cause, see **Hopkins v. Saunders**, 199 F.3d 968, 975 (8th Cir. 1999) (public employee had protected property interest in employment if could have only been terminated for good cause), and not if he was being laid-off for lack of funds.  Defendants argue that Plaintiff was accorded all the process due him because he was properly laid-off.

Plaintiff counters that he was terminated in retaliation for exercising his First Amendment rights; thus, he was entitled to notice and a hearing. The breath of the process to which Plaintiff was due depends on the resolution of the factual dispute about why Plaintiff is no longer working for the Water Division.[21]

Punitive Damages. Citing the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and eight sections of Article I of the Missouri Constitution, Defendants further argue that Plaintiff's claim for punitive damages violates their constitutional rights. Plaintiff seeks such damages in Count II based on allegations that "[t]he conduct of defendant Visintainer was intentional and malicious and/or in reckless disregard of [Plaintiff's] civil rights . . . ." (Compl. ¶ 21.)

"'Punitive damages are appropriate in a federal civil rights action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" **Quigley v. Winter**, 598 F.3d 938, 952-53 (8th Cir. 2010) (quoting Badami v. Flood, 214 F.3d 994, 997 (8th Cir. 2000)) (finding punitive damages award of $54,750 to be appropriate); accord **Swipies v. Kofka**, 419 F.3d 709, 717-18 (8th Cir. 2005); **Angarita v. St. Louis County**, 981 F.2d 1537, 1546 (8th Cir. 1992).

---

[21]"Due process requires 'some kind of a hearing' prior to [a public employee's] termination. If a full post-termination hearing is available, the pre-termination hearing may be 'something less than a full evidentiary hearing' but should serve as an 'initial check against mistaken decisions.'" **Larson v. City of Fergus Falls**, 229 F.3d 692, 696 (8th Cir. 2000) (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)). The question of what due process requires will be reached in the instant case only if the trier of fact finds that Plaintiff was not laid off for lack of funds.

## Conclusion

A genuine issue of material fact remains as to what forum should hear Plaintiff's challenge to his layoff , as to whether he was laid-off in retaliation for complaints of misuse of public funds, and as to whether he was denied due process when laid-off.  Plaintiff has failed, however, in Count II of his complaint to state a claim against the City of St. Louis. Those claims are dismissed.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part as set forth above.  [Doc. 47]


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  3rd  day of August, 2010.